| | | |
|---|---|---|
| **GENERATION CHANGERS CHURCH.** individually and on behalf of all others similarly situated, | ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No. 3:21-cv-00764** **Judge Aleta A. Trauger** |
| **v.** | ) ) | |
| **CHURCH MUTUAL INSURANCE COMPANY,** | ) ) ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Church Mutual Insurance Company ("CMIC") has filed a Motion to Dismiss Claims Arising Under Non-Tennessee Law for Lack of Standing or, In the Alternative, for Judgment on the Pleadings on Claims Arising Under Texas Law (Doc. No. 49), to which Generation Changers Church ("GCC") has filed a Response (Doc. No. 53), and CMIC has filed a Reply (Doc. No. 55). GCC has filed a Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel (Doc. No. 67), to which CMIC has filed a Response (Doc. No. 79), and GCC was filed a Reply (Doc. No. 85).[1] For the reasons set out herein, CMIC's motion will be denied, and GCC's motion will be granted in part and denied in part.

## I. BACKGROUND

CMIC is a Wisconsin-based insurance company that sells property insurance to churches. (Doc. No. 47 ¶ 2.) Some of its policies entitle the insured to receive the "actual cash value," or "ACV," of its loss. ACV, generally speaking, refers to "the cost to replace damaged property with

---

[1] The parties have also filed various supplemental authorities and related briefing. (*See* Doc. Nos. 59, 62, 73, 78, 86, 89.)

new property of similar quality and features," after that sum has been "reduced by the amount of depreciation applicable to the damaged property immediately prior to the loss." *Lammert v. Auto-Owners (Mut.) Ins. Co.*, 572 S.W.3d 170, 171 (Tenn. 2019). By reducing the insured's payout to reflect depreciation, ACV ensures that the insured does not receive a windfall by replacing an aged, worn feature of its property with a brand new one. *Id.* at 175.

"Depreciation," however, can mean different things. There is what one could call "literal" or "physical" depreciation—that is, the actual diminution in value of an existing object, like a vehicle or some roofing materials. Because depreciation is fundamentally an accounting exercise, however, one can also calculate what could be called "paper" depreciation of assets that do not actually have a physical embodiment capable of degrading over time, such as labor. States have come down on different sides of the question of whether an insurer's calculation of ACV should typically include depreciation of labor. *See Lammert*, 572 S.W.3d at 175–179 (collecting cases). In 2019, the Tennessee Supreme Court held that, if an insurance policy is ambiguous regarding whether ACV should reflect depreciation of labor, then the policy should be construed in favor of the insured—that is, without labor depreciation. *Id.* at 179.

GCC is a church based in Nashville. (Doc. No. 47 ¶ 1.) It purchased a CMIC policy covering two properties in the Nashville area. (*Id.* ¶ 10.) On March 3, 2020, Middle Tennessee was struck by tornados that, among other things, damaged structures covered by GCC's CMIC policy. (*Id.* ¶ 13.) CMIC calculated the ACV of the loss by depreciating both materials and labor. (*Id.* ¶¶ 16, 26–32.)

On October 5, 2021, GCC filed a Class Action Complaint against CMIC based on that practice. (Doc. No. 1.) That Complaint has since been superseded, and the operative Complaint is the Second Amended and Supplemental Class Action Complaint filed on September 26, 2022

2

(Doc. No. 47). The Second Amended and Supplemental Class Action Complaint states one count for breach of contract and one for declaratory judgment. (*Id.* ¶¶ 50–65.) GCC wishes to represent a class including policyholders from ten states: Arizona, California, Illinois, Kentucky, Missouri, Mississippi, Ohio, Tennessee, Texas, and Vermont. (*Id.* ¶ 35.) GCC does not (and could not plausibly) purport to have its own claim under the laws of any of those states other than Tennessee. GCC argues, however, that each of those states, like Tennessee, interprets ACV to exclude depreciation of labor, and other members of the putative class will have claims arising under the laws of the other states.

On December 27, 2022, CMIC filed its Motion to Dismiss Claims Arising Under Non-Tennessee Law for Lack of Standing or, In the Alternative, for Judgment on the Pleadings on Claims Arising Under Texas Law (Doc. No. 49). GCC opposes that motion and has since filed a Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel (Doc. No. 67).

## II. MOTION TO DISMISS/FOR JUDGMENT ON THE PLEADINGS

### A. Subject Matter Jurisdiction

CMIC argues that GCC can only assert claims that it has standing to bring, and it has no standing to bring a claim under any state's laws but Tennessee's.[2] CMIC suggests that the court, therefore, must dismiss GCC's assertion of claims on behalf of non-Tennessee putative class members. GCC argues that this view is mistaken and that the relevant standing, for these purposes, is the standing of those class members to state their own claims, which GCC would, if a class were

---

[2] CMIC characterizes this argument as involving subject matter jurisdiction, and it frames its arguments accordingly. Multistate actions have also, at times, raised challenging issues of personal jurisdiction, *see Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 265 (2017), but the court will, at this juncture, focus on the arguments raised by the parties.

certified, merely be pursuing on their behalf. Accordingly, GCC argues, there is no basis for dismissing such claims for want of jurisdiction.[3]

<u>1. Legal Standard</u>

"If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack "questions merely the sufficiency of the pleading," and the trial court therefore takes the allegations of the complaint as true. *Wayside Church v. Van Buren Cnty.*, 847 F.3d 812, 816 (6th Cir. 2017) (quoting *Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007); citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). Because CMIC argues that GCC's claims, as pleaded, warrant dismissal as a matter of law, its motion presents a facial challenge.

<u>2. Analysis</u>

Article III of the Constitution gives the federal courts jurisdiction only over "cases and controversies," of which the component of standing is an "essential and unchanging part." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). To establish standing under the Constitution, a plaintiff must show that: (1) it has suffered an "injury in fact" that is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief requested. *Gaylor v. Hamilton Crossing*

---

[3] The court notes that it is questionable whether this issue is even appropriate for consideration in connection with a motion to dismiss filed prior to class certification. (*See* Doc. No. 78-2 at 41–42 (Order in *Williams v. State Farm Mut. Auto. Ins. Co.*, No. 22 C 1422 (N.D. Ill. June 21, 2023) (deferring consideration).) In this instance, however, the court will be considering class certification alongside the Motion to Dismiss, so there is no need to consider whether a motion to dismiss based on this theory would be appropriate, standing alone. One way or another, these issues are before the court.

*CMBS*, 582 F. App'x 576, 579–80 (6th Cir. 2014) (citing *Lujan*, 504 U.S. at 560–61); *see also Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). These constitutional requirements—commonly known as (1) injury-in-fact, (2) causation, and (3) redressability—apply in every case.

The injury-in-fact component requires the plaintiff to "allege an injury to himself that is 'distinct and palpable.'" *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). For an injury to be sufficiently "particularized," it "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citation and internal quotation marks omitted). There is no dispute that GCC has alleged a concrete injury that is particular to GCC—that is, the monetary loss it incurred based on CMIC's policy of depreciating labor in its AVC calculation. There is also no dispute that other insurance policyholders' similar injuries would be equally concrete and particular to those plaintiffs. Those plaintiffs' injuries, however, are not particular to GCC. GCC therefore lacks standing to bring those claims directly on its own behalf.

GCC, however, is not trying to bring those claims on its own behalf. It is seeking to bring the claims of other plaintiffs on behalf of those other plaintiffs, purely as a class action representative. Such a course of action is expressly permitted by Rule 23 of the Federal Rules of Civil Procedure, if certain requirements are met. Allowing one party to sue on behalf of another is, it bears noting, commonplace and, much of the time, uncontroversial. Guardians sue on behalf of children. *See* Fed. R. Civ. P. 17(c)(1). Shareholders sue on behalf of corporations. *See* Fed. R. Civ. P. 23.1. Whistleblowers sue on behalf of governments. *See* 31 U.S.C. § 3730(b)(1). Each of these practices is consistent with ordinary standing requirements, because the fact that a claim is being asserted through a representative does not negate the essential connection between the true

5

plaintiff and that plaintiff's claim. Regardless of who oversees the prosecution of such a claim, the claim itself still belongs to its original owner, and it is that ultimate plaintiff's standing that is being asserted, not any freestanding right of the representative. *See Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000) (finding that uninjured party could bring claim as a relator because "the assignee of a claim has standing to assert the injury in fact suffered by the assignor").

CMIC does not dispute that Rule 23, generally speaking, permits a representative plaintiff to assert claims on behalf of other injured parties, based on those parties' distinct particularized injuries. CMIC argues, however, that GCC should only be permitted to bring claims on behalf of plaintiffs whose own claims, like GCC's, are based on Tennessee law. From the perspective of constitutional standing, that distinction makes very little sense. GCC's lack of direct standing to raise claims based on the injuries of others has nothing to do with the state those injuries occurred in, but rather on the fact—as true of Tennessee putative class members as it is of non-Tennessee putative class members—that those other parties' injuries are not particular to GCC. There is little reason to think, then, that any issue of constitutional standing would depend on such a distinction.

Much of the confusion around this issue probably arises from the unnecessarily confounding way that federal courts have sometimes used the term "standing" to refer to two entirely different concepts: one focused on what the Constitution requires, and the other focused on who has been substantively authorized to bring a claim. *See In re Capital Contracting Co.*, 924 F.3d 890, 896 (6th Cir. 2019) (recognizing that the Supreme Court has "clarified that prior decisions invoking the 'prudential standing' label had really asked a statutory-interpretation question: Does the specific statute give the specific plaintiff a right to bring the specific suit?") (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014)) *Galaria v. Nationwide Mut. Ins. Co.*, 663 F. App'x 384, 391 (6th Cir. 2016) (recognizing that the prior use

6

of "standing" was arguably "misleading") (quoting *Lexmark*, 572 U.S. at 128 n.4). CMIC's argument that a class action plaintiff *can* assert representative claims based on the laws of his own state but *cannot* assert representative claims based on the laws of other states is, contrary to CMIC's briefing, really about the second, not the first, of those two sets of concerns. A lack of personal, direct constitutional standing to bring the claims of others exists in every class action case, whether the members of the class live in the same state or are dispersed nationwide. Rule 23 allows the lead plaintiff to sidestep that problem—not because Rule 23 changes anything about standing itself, *see* Fed. R. Civ. P. 82 ("These rules do not extend or limit the jurisdiction of the district courts")—but simply by taking the unremarkable step of allowing one party to prosecute the claim of another, as that other party's representative. The question posed by CMIC's motion, then, is not "Does a plaintiff in one state have constitutional standing to raise claims arising from other parties' injuries in other states?," but, rather, "Does Rule 23 permit a plaintiff to act as the representative of other plaintiffs whose claims arise under the laws of states other than the plaintiff's own?"

The text of Rule 23 strongly suggests that it does. For one thing, the Rule contains no express suggestion that it is categorically impermissible for a plaintiff to pursue a class action based on the laws of multiple states. The Rule, moreover, contains multiple provisions that would permit a district court to consider the particular challenges associated with multistate cases, and each of those provisions embodies a case-specific approach. Rule 23(a)(2) requires there to be "questions of law or fact common to the class." Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." If the putative class representative seeks to rely on Rule 23(b)(3)—as plaintiffs frequently do and as GCC does here—then the plaintiff must also establish that "questions of law or fact common to class members

predominate over any questions affecting only individual members." The fact that a putative class would require the court to consider claims under the laws of multiple states is relevant to each of those inquiries. Nothing about the language of the provisions, however, suggests that the presence of claims from multiple states necessarily means that a class certification should fail. A holding to the contrary, then, would amount to a departure from the case-specific analysis that Rule 23 requires.

As GCC points out, several U.S. circuit courts have agreed with its position and held that a representative plaintiff's reliance on Rule 23 to pursue claims arising under the laws of other states does not violate the ordinary requirements of subject matter jurisdiction. *See In re Zantac (Ranitidine) Prod. Liab. Litigation*, No. 21-10335, 2022 WL 16729170, at *6 (11th Cir. Nov. 7, 2022) ("In sum, all circuits which have addressed whether a plaintiff can represent unnamed class members whose claims fall under different states' laws have concluded that it is a question that concerns Rule 12(b)(6) or Rule 23—not Article III."); *Mayor of Baltimore v. Actelion Pharms. Ltd.*, 995 F.3d 123, 134 (4th Cir. 2021) (holding that variation between states presents an issue to be considered under Rule 23, not by striking claims from a complaint); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 48 (1st Cir. 2018) (recognizing "the named plaintiffs' standing to bring claims on behalf of class members whose claims arise under the laws of the twenty-two states within which no named plaintiff has either resided or purchased the relevant . . . products during the class period"); *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 93 (2d Cir. 2018) ("As long as the named plaintiffs have standing to sue the named defendants, any concern about whether it is proper for a class to include out-of-state, nonparty class members with claims subject to different state laws is a question of predominance under Rule 23(b)(3), not a question of 'adjudicatory competence' under Article III" (citations omitted)); *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536

(7th Cir. 2011) ("If the Illinois Consumer Fraud Act law does not apply because events were centered outside Illinois, then plaintiffs must rely on some other state's law; this application of choice-of-law principles has nothing to do with standing, though it may affect whether a class should be certified . . . .").

Although no federal appellate court has adopted CMIC's position, some district courts, including some in this circuit, have been receptive to such arguments. *See, e.g.*, *Rivers of Life Int'l Ministries v. GuideOne Ins. Co.*, No. 122-CV-01114-STA-jay, 2022 WL 17261845, at *6 (W.D. Tenn. Nov. 18, 2022) (dismissing all claims brought by Tennessee-based putative class representative under non-Tennessee law); *Szep v. Gen. Motors LLC*, 491 F. Supp. 3d 280, 291 (N.D. Ohio 2020) (same, with regard to Ohio plaintiff and non-Ohio claims); *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-MD-02042, 2012 WL 2917365, at *7 (E.D. Mich. July 17, 2012) (same, with regard to several states); *Smith v. Laws. Title Ins. Corp.*, No. 07-12124, 2009 WL 514210, at *3 (E.D. Mich. Mar. 2, 2009) (same, with regard to Michigan plaintiff and non-Michigan claims).

Each of those cases, however, makes the same conceptual error that CMIC is urging this court to make: they devote all their attention to establishing the representative plaintiff's lack of *personal* standing to assert out-of-state claims, when what they should actually be considering are the *representational* powers conferred on a lead plaintiff by Rule 23. *See, e.g.*, *Rivers of Life*, 2022 WL 17261845, at *6 (dismissing putative class action claims raised on behalf of out-of-state plaintiffs because the representative "[p]laintiff suffered no injury in the other states and has no connection to those states"); *Szep*, 491 F. Supp. 3d at 291 ("Plaintiff does not assert that he suffered injury in any other state. As a result, the court finds that [he] does not have standing to maintain his nationwide class allegation . . . ."); *In re Refrigerant Compressors Antitrust Litig.*, 2012 WL

9

2917365, at \*7 (dismissing claims because the complaint "contain[ed] no factual allegations that connect any injuries by the named . . . Plaintiffs to any causes of action arising in these states"); *Smith*, No. 07-12124, 2009 WL 514210, at \*3 (E.D. Mich. Mar. 2, 2009) ("In this case, besides the state of Michigan, the plaintiff has not alleged injury in any other state, nor are his particular claims based on the application of the laws of any other state. Consequently, the plaintiff lacks standing to bring state law claims arising under the laws of [those states].").[4]

A focus on constitutional standing misses the point. CMIC is quite right that GCC lacks standing to bring a claim, on its own behalf, based on the injury of, for example, a Louisiana policyholder who was underpaid by CMIC. But GCC also lacks personal standing to bring such a claim based on the injury of any other Tennessee policyholder, as well. Such deficiencies, moreover, are present in every class action case, because allowing a plaintiff, acting in a representative capacity, to assert the claims of others is, at a fundamental level, what Rule 23 is all about. If it really were the case that a class action plaintiff must have personal standing with regard to each injury of each class member, then Rule 23 would be a meaningless contradiction. Representative plaintiffs would be unable to represent anyone but themselves.

This court, however, has no power to throw out the well-settled Rule 23 framework that has applied in federal courts for decades. As the Sixth Circuit has acknowledged, Rule 23 provides plenty of opportunities for a court to consider the extent to which the law underlying the claims of

---

[4] While the absence of a Sixth Circuit precedent clearly resolving this issue permitted such outcomes, there does not appear to be anything unique about the Sixth Circuit's general standing or class action jurisprudence that would lend especial support for CMIC's position. To the contrary, the U.S. District Court for the Eastern District of Michigan has held that the other circuits' shared position of permitting such claims to be raised through Rule 23 is "consistent with the two most relevant decisions from the Sixth Circuit . . . ." *Johnson v. FCA US LLC*, 555 F. Supp. 3d 488, 496 (E.D. Mich. 2021) (citing *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943 (6th Cir. 2011); *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir. 1998)); *see also Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cnty., Tennessee v. Momenta Pharms., Inc.*, 333 F.R.D. 390, 413 (M.D. Tenn. 2019) (Crenshaw, C.J.) (applying rule adopted by other circuits).

a putative class "differs from jurisdiction to jurisdiction." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996). That is the mechanism through which the differences between individual states' laws can and should be considered. CMIC's jurisdictional argument, however, fails.

## B. Judgment on the Pleadings as to Texas Claims

CMIC argues that, if the court does not dismiss all of the non-Tennessee claims for lack of standing, it should still dismiss the Texas claims, because GCC has erred in assuming that Texas excludes depreciation of labor from the calculation of ACV. (*Id.* at 2.) After CMIC filed its motion, the U.S. District Court for the Western District of Texas issued two opinions contradicting CMIC's position and interpreting Texas law to exclude labor depreciation in the calculation of ACV unless expressly permitted by a policy. *See Sims v. Allstate Fire & Cas. Ins. Co.*, 2023 WL 175006, at *4 (W.D. Tex. Jan. 11, 2023). (*See also* Doc. No. 59-1 at 4–5 (unpublished Order).) CMIC argues that those decisions were erroneous. (Doc. No. 55 at 4; Doc. No. 62 at 1.)

### 1. Legal Standard

A motion for judgment on the pleadings under Rule 12(c) is governed by the same standards that govern a motion to dismiss for failure to state a claim under Rule 12(b)(6). *See Reilly v. Vadlamudi*, 680 F.3d 617, 622-23 (6th Cir. 2012). In deciding a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002).

The Federal Rules of Civil Procedure require that a plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (quoting Fed. R. Civ.

11

P. 8(a)(2)). The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[threadbare] recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

2. Analysis

As the Supreme Court recognized in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), "no clause in the Constitution purports to confer . . . upon the federal courts" any "power to declare substantive rules of common law applicable in a state." *Id.* at 78. Federal courts can, and frequently must, apply state law, but the actual substance of that law must be "declared by [that state's] Legislature in a statute or by its highest court in a decision." *Id.* In order to honor those boundaries, the Supreme Court has held that, "[w]hen resolving an issue of state law," a federal court must "look to the final decisions of that state's highest court, and if there is no decision directly on point, then [it] must make" what is sometimes referred to as "an *Erie* guess"—that is, an informed prediction as to how the state's court of last resort, "if presented with the issue, would resolve it." *In re Fair Fin. Co.*, 834 F.3d 651, 671 (6th Cir. 2016) (quoting *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013)).

This court's task, therefore, is not to engage in an academic investigation of whether ACV calculations should, in some absolute sense, include or exclude depreciation of labor. Indeed, it is not even the place of this court to reach its own, independent conclusion regarding what Texas law is on this issue. Rather, the sole question before the court is what the Texas Supreme Court would,

12

more likely than not, do if presented with this issue. For those purposes, the opinions of district courts with substantial experience applying the law of Texas is especially persuasive.

The analysis adopted in the recent district court opinions, moreover, makes sense. The court observed that Texas law defining ACV was "substantially similar" to Mississippi law, *Sims*, 2023 WL 175006, at *4, which the Fifth Circuit had already held, in *Mitchell v. State Farm Fire & Cas. Co.*, 954 F.3d 700, 706 (5th Cir. 2020), to exclude depreciation of labor unless expressly permitted. *Mitchell*, in turn, based that holding on its conclusions that (1) ACV is an ambiguous term that could be defined either way and (2) policies that are silent on the depreciation of labor in ACV should, consistently with Mississippi's usual rule regarding ambiguous insurance contracts, be construed against the insurer. *Id.* at 705 (citing *Bellefonte Ins. Co. v. Griffin*, 358 So. 2d 387, 390 (Miss. 1978)). The Texas Supreme Court recognizes the same general rule. *See RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) (citing *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991)).

CMIC argues that the recent decisions cited by GCC reached the incorrect conclusion regarding Texas law for two reasons: (1) they failed to account for the fact that Texas law expressly recognizes that "replacement costs" include labor; and (2) "Texas law unambiguously states that 'replacement costs' are subject to depreciation . . . ." *Tolar v. Allstate Texas Lloyd's Co.*, 772 F. Supp. 2d 825, 831 (N.D. Tex. 2011). The first of those points, however, does not undermine GCC's position in the slightest, because GCC certainly does not dispute that labor is, broadly speaking, a part of replacement costs. The second point relies on an isolated quotation from a district court opinion involving the depreciation of sales tax and general contractor overhead and profit. *Id.* Insofar as that holding creates some tension with the more recent decisions, this court is more

inclined to follow the decisions that were issued more recently—and therefore reflect more up-to-date *Erie* determinations.

In any event, the court also finds the analysis set forth by the Fifth Circuit in *Mitchell* and extended to Texas law by the district courts to be more persuasive. The conclusion that the definition of ACV used in the relevant insurance policies is ambiguous is inescapable, as the mountains of litigation over that issue attest. In the presence of such true ambiguity, Texas law requires the court to construe the term in favor of the insured. *See RSUI Indem. Co*, 466 S.W.3d at 118. The court therefore will not grant CMIC judgment on the pleadings as to the Texas claim.

The court stresses, however, that this is merely its best guess as to what Texas law is on this subject, and that guess may be wrong. While the motion to dismiss requires the court to resolve that uncertainty in one way or the other, the presence of such uncertainty may, as the court will address later in this decision, bear on the question of whether Texas-based claims can be efficiently included in a multistate class.

### III. MOTION TO CERTIFY CLASS

GCC seeks certification of a class defined as follows:

All Church Mutual Insurance Company ("CMIC") policyholders (or their lawful assignees) who made: (1) a structural damage claim for property located in Arizona, California, Illinois, Kentucky, Missouri, Mississippi, Ohio, Tennessee, Texas and/or Vermont; and (2) for which CMIC itself accepted coverage and then chose to calculate actual cash value exclusively pursuant to the replacement cost less depreciation methodology and not any other methodology, such as fair market value; and (3) which resulted in an actual cash value payment during the class period from which non-material depreciation was withheld from the policyholder; or which should have resulted in an actual cash value payment but for the withholding of non-material depreciation causing the loss to drop below the applicable deductible.

In this definition, "non-material depreciation" means application of either the "depreciate removal," "depreciate non-material" and/or "depreciate O&P" option settings within Xactimate® software or similar depreciation option settings in competing commercial software programs.

14

The class excludes any claims for which the applicable limits of insurance have been exhausted by initial actual cash value payments.

The class also excludes any claims arising under labor depreciation permissive policy forms, i.e., those forms and endorsements permitting the "depreciation" of labor within the text of the policy form, unless the use of those forms violate the law of the respective state at issue.

For structures located in Arizona, California, Illinois, Kentucky, Ohio, Tennessee, Texas, and Vermont, the class period only includes policyholders with claims having a date of loss on or after October 5, 2019, through the present. For Mississippi structures, the class period only includes policyholders with claims having a date of loss on or after October 5, 2018, through the present. For Missouri policyholders, the class period only includes policyholders with claims having a date of loss on or after September 26, 2012, through the present.

(Doc. No. 67 at 1–2.) CMIC argues that GCC has failed to satisfy the requirements for class certification for several reasons, including the fact that the multistate nature of the proposed class would prove too unwieldy to justify the use of the class action form.

## A. Legal Standard

The principal purpose of class actions is to achieve efficiency and economy of litigation, both with respect to the parties and the courts. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 159 (1982). The Supreme Court has observed that, as an exception to the usual rule that litigation is conducted by and on behalf of individual named parties, "[c]lass relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" *Id.* at 155 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). The Court directs that, before certifying a class, district courts must conduct a "rigorous analysis" of the prerequisites of Rule 23. *Id.* at 161. The Sixth Circuit has stated that district courts have broad discretion in deciding whether to certify a class, but that courts must exercise that discretion within the framework of Rule 23. *Coleman v. Gen.*

*Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

Although a court considering class certification should not inquire into the merits of the underlying claim, a class action may not be certified based merely on its designation as such in the pleadings. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974); *In re Am. Med. Sys.*, 75 F.3d at 1079. In evaluating whether class certification is appropriate, "it may be necessary for the court to probe behind the pleadings," as the issues concerning whether it is appropriate to certify a class are often "enmeshed" within the legal and factual considerations raised by the litigation. *Falcon*, 457 U.S. at 160; *see also In re Am. Med. Sys.*, 75 F.3d at 1079; *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974). Moreover, the party seeking class certification bears the burden of establishing that the requisites are met. *See Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003); *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 522 (6th Cir. 1976). "[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23 . . . ." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014).

A class action will be certified only if, after thorough analysis of the evidence presented, the court is satisfied that the prerequisites of Fed. R. Civ. P. 23(a) have been met and that the action falls within one of the categories described in Fed. R. Civ. P. 23(b). *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016). Compliance with Rule 23(a) requires the proposed class to satisfy each of four requirements, typically referred to as (1) numerosity, (2) commonality, (3) typicality and (4) adequacy of representation. *Comcast v. Behrend*, 569 U.S. 27, 33 (2013). Then, if putative class representatives are able to meet all four of the requirements of Rule 23(a), they next must produce evidence sufficient to establish that their case falls within at

16

least one of the three types of case listed as appropriate for class resolution in Rule 23(b). *Id.* at 34. In this instance, the plaintiffs seek to rely on Rule 23(b)(3), which allows for certification of a Rule 23(a)-compliant class if

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
>> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>>
>> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>>
>> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>>
>> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

**B. Analysis**

1. Rule 23(a)

*a. Numerosity*

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. Although there is no strict numerical test, substantial numbers usually satisfy the numerosity requirement. *Gilbert v. Abercrombie & Fitch Co.*, No. 2:15-cv-2854, 2016 WL 4159682, at * 4 (S.D. Ohio Aug. 5, 2016) (citing *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006)). "There is no magic minimum number that will breathe life into a class." *Russo v. CVS Pharmacy, Inc.*, 201 F.R.D. 291, 294 (D. Conn. 2001) (quoting *Jones v. CCH–LIS Legal Info. Servs.*, 1998 WL 671446, *1 (S.D.N.Y. Sept. 28, 1998)). A plaintiff must show some evidence of or reasonably estimate the number of class members, and, in assessing numerosity, the court may

17

make common sense assumptions without the need for precise quantification of the class. *Id.* "[T]he exact number of class members need not be pleaded or proved" for a class to be certified, as long as the class representative can show that joinder would be impracticable. *Golden v. City of Columbus*, 404 F.3d 950, 965–66 (6th Cir. 2005) (quoting *McGee v. E. Ohio Gas Co.*, 200 F.R.D. 382, 389 (S.D. Ohio 2001)).

GCC has presented evidence, based on CMIC claims data, that the number of CMIC insurance claims potentially implicated by the ACV issue numbers in the thousands. (*See, e.g.*, Doc. No. 68-1 at 58–66; Doc. No. 72-7 ¶ 39.) Some of those claims, the court assumes, share the same beneficiary, but CMIC has not identified any reason to doubt that the number of potential class members remains well above the threshold to satisfy the numerosity requirement. The court therefore concludes that GCC has satisfied Rule 23(a)(1).

### *b. Commonality*

CMIC argues that the proposed class's reliance on the laws of several states prevents GCC from satisfying Rule 23(a)(2)'s requirement that there be "questions of law or fact common to the class." Even if the variation between the laws of the proposed class members' states were considerable, however, it would not prevent CMIC from satisfying the relatively undemanding requirements of Rule 23(a)(2), which considers only whether there is at least a "single common question" of sufficient importance between the putative class members' cases, leaving it to Rule 23(b)(3)—if that is the subdivision of Rule 23(b) that the plaintiff relies upon—to tackle the significantly more demanding question of whether the shared issues "predominate." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (citation and brackets omitted).

Rule 23(a)(2) is not entirely toothless. Any randomly selected civil case is likely to share *some* question with any other randomly selected civil case, even if the shared question is just "What

18

must a complaint include to satisfy Rule 8 of the Rules of Civil Procedure?" or "Must a federal court have personal jurisdiction over the defendant?" Those questions, though, are not enough to satisfy Rule 23(a)(2). The type of potentially shared questions that Rule 23(a)(2) focuses on are those questions that bear on the foundational issue of whether the class members have, at least in some sense, "suffered the same injury." *Wal-Mart Stores, Inc.*, 564 U.S. at 350 (quoting *Falcon*, 457 U.S. at 153).

Each claim of the members of the proposed class will call on the court to consider the central factual questions of what "ACV" is generally understood to mean and how it is used in the insurance field. That issue does not capture the entire case, of course, but Rule 23(a)(2) does not require it to. Rather, Rule 23(a)(2) requires only that there be at least one shared question giving potential rise to a shared injury, which the question of whether labor should be depreciated as part of ACV unambiguously does. The court therefore finds that GCC has satisfied Rule 23(a)(2).

### c. Typicality

Generally speaking, the typicality requirement of Rule 23(a)(3) is met if the class members' claims are "fairly encompassed" by the named plaintiff's claims. *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (quoting *Am. Med. Sys.*, 75 F.3d at 1082). This requirement ensures that the class representative's "interests are aligned with the interests of the represented class members so that, by pursuing [its] own interests, the class representative[] also advocate[s] the interests of the class members." *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 852–53 (6th Cir. 2013) (citing *Sprague*, 133 F3d at 399). In most cases, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and if the claims are based on the same legal theory. *In re Am. Med. Sys., Inc.*, 75 F.3d at 1082.

GCC has presented evidence, including testimony by CMIC's Rule 30(b)(6) witness, establishing that CMIC generally relied on three standard-form policies that did not vary between jurisdictions, all three of which CMIC, at least sometimes, treated as permitting depreciation of labor when calculating ACV. (*See* Doc. No. 68-1 at 150–52.) GCC has also provided an expert analysis by consultant Toby Jerrell Johnson, confirming that GCC's claims were processed in accordance with that approach. (Doc. No. 68-3 ¶¶ 57–58.) The court therefore finds that GCC's claims are typical of the class, in terms of facts and theory of the case.

CMIC argues that GCC's claims could, at most, be typical for a class member based in Tennessee, but that, because it does not possess claims under the laws of any other states, its claims cannot be "typical" of those of the rest of the class. Of the various Rule 23 provisions relevant to this case, Rule 23(a)(3) is probably the one theoretically most capable of supporting the kind of absolute barrier to cross-state representation that CMIC seeks. "Typical" is not a precisely defined word, and one could plausibly argue that a claim for breach of contract under Tennessee law is only typical of other claims for breach of contract under Tennessee law—even if claims under other states' laws would look similar or even functionally identical. The established law regarding typicality, however, counsels against such an assumption.

First, there is notably little support in caselaw for the proposition that the assertion of claims under the laws of multiple states categorically defeats a showing of typicality. To the contrary, "courts rarely deny certification simply because the class spans many states and asserts state-law claims." *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 292 (N.D. Ohio 2014) (citing *In re Pharm. Indus. Average Wholesale Price Litig.*, 252 F.R.D. 83, 107 (D. Mass. 2008)). If courts did adopt that categorical approach, it would amount to a major rule of class action law. Given the significance that such a rule would have, the lack of actual support for it is striking.

20

The lack of caselaw support for a state-specific typicality requirement would not be an obstacle if the text of Rule 23(a)(3) called for such an approach, but it does not. As the court has already noted, the language of the rule is ambiguous regarding what "typicality" means, but nothing in the rule suggests, either explicitly or implicitly, that claims must arise under the same state's laws in order to be typical of each other. Rule 23, moreover, was drafted against the backdrop of our actual, existing legal system, and that system is not one in which the fifty states' laws differ wildly and might only occasionally, by happenstance, overlap. To the contrary, there are well-established areas—particularly involving longstanding concepts of contracts and torts— in which many which states' laws are identical or close to it. Classes like this have always been foreseeable, and the drafters of Rule 23 took no clear steps to prevent them. There is little reason to assume, then, that Rule 23(a)(3)'s conception of typicality necessarily excludes the possibility of a claim under one state's laws being typical of claims under other states' laws, as long as the actual laws themselves are sufficiently substantively similar.

GCC has identified authority applicable to each of the ten states at issue, suggesting that each state takes the same approach (or an even more beneficiary-friendly approach) to the depreciation of labor in ACV. (*See* Doc. No. 70-8.) The court will go into greater detail regarding the question of just how similar the relevant states' laws are later in this opinion. GCC, however, has shown that, insofar as it is correct regarding the similarities between those respective bodies of law, then its claims are typical of those of the proposed class.

### d. Adequacy of Representation

"If the absent members [of a class] are to be conclusively bound by the result of an action prosecuted or defended by a party alleged to represent their interests, basic notions of fairness and justice demand that the representation they receive be adequate." 7A Wright & Miller, Fed. Prac.

& Proc. Civ. § 1765 (4th ed.). The presence of an adequate class representative is therefore an indispensable prerequisite if a court is to permit a class action to proceed. At the same time, however, it is well-settled that "the named representative of a class . . . need not be the best of all possible plaintiffs"—merely an adequate one. *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 482 (W.D. Mich. 1994) (citing *Ashe v. Bd. of Elections in City of New Yo*rk, 124 F.R.D. 45, 50 (E.D.N.Y. 1989)). This inquiry encompasses issues such as whether "the proposed class representatives' interests [are] antagonistic to those of other class members" and whether "their attorneys [are] qualified, experienced and able to conduct the litigation." *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 50 (S.D.N.Y. 2012); *cf. Hansberry v. Lee*, 311 U.S. 32, 44 (1940) (noting that the "dual and potentially conflicting interests" of parties made it "impossible to say . . . that any two of them are of the same class").

CMIC's argument under Rule 23(a)(4), like most of its other arguments, focuses on the multistate nature of the case: CMIC argues that GCC cannot be counted on to be an effective representative of non-Tennessee plaintiffs, given that all that it needs to establish in order to succeed on its own claims is that CMIC's method for calculating ACV violated Tennessee law. Such an argument might be persuasive if CMIC identified some Tennessee-specific argument that would place GCC at cross-purposes with other class members—for example, an argument that Tennessee consciously adopted a position on a key issue in order to differentiate its laws from the laws of other states in the class. In the absence of such a specific defect, however, the difference between states is, at least for the purposes of Rule 23(a)(4), no more concerning than any other of the routine differences that arise between class members—worth considering, but problematic only if the differences are wide enough and important enough to undermine the usefulness of the class action form.

The court finds that CMIC has failed to identify any differences sufficient to refute GCC's demonstration of its effectiveness as a class-wide representative for the purposes of Rule 23(a)(4). GCC has provided evidence establishing that its attorneys are experienced litigators with substantial expertise relevant to this case. (*See* Doc. No. 71-1 (Declaration of J. Brandon McWherter), -2 (Declaration of Erik D. Peterson), -3 (Declaration of T. Joseph Snodgrass).) Its attorneys' actions so far in this case have, moreover, demonstrated diligent attention to the interests of the class and to the unique challenges associated with multistate class action litigation. The court accordingly finds that GCC has satisfied Rule 23(a)(4) and is entitled to certification of its proposed class, if it can satisfy Rule 23(b)(3).

### 2. Rule 23(b)(3)

To qualify for class certification under Rule 23(b)(3), the proponent of a class must show that: (1) common questions of law or fact "predominate over any questions affecting only individual members"; and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Subdivision (b)(3) parallels subdivision (a)(2), in that both require that common questions exist, but subdivision (b)(3) contains the more stringent requirement that common issues 'predominate' over individual issues. *In re Am. Med. Sys.*, 75 F.3d at 1084 (citation omitted). Accordingly, rather than simply confirming that some issue is shared, as Rule 23(a)(2) requires, a court performing a Rule 23(b)(3) analysis must "add up all the suit's common issues (those that the court can resolve in a yes-or-no fashion for the class) and all of its individual issues (those that the court must resolve on an individual-by-individual basis)" and "then qualitatively evaluate which side 'predominates' over the other." *Fox v. Saginaw Cnty., Michigan*, 67 F.4th 284, 300 (6th Cir. 2023) (citing *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453–54 (2016); *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d

23

405, 413 (6th Cir. 2018)). The plaintiff seeking class certification "need not prove that every element can be established by classwide proof" but should "identify[] the substantive issues that will control the outcome" and "consider how a trial on the merits would be conducted if a class were certified." *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.,* 863 F.3d 460, 468 (6th Cir. 2017) (citing *Bridging Cmtys.*, 843 F.3d at 1124; *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008)).

Rule 23(b)(3)—unlike most of the provisions of Rule 23(a)—calls on the court to fully grapple with the fact that GCC wishes to represent plaintiffs from numerous states, stating claims under those states' distinct respective bodies of law. CMIC has probably overstated the importance of that factor to most of the questions that the court has addressed, but its prominence is warranted here. The fact that the laws of so many states are implicated by the proposed class genuinely does pose a considerable obstacle to GCC's ability to establish that its proposed class complies with Rule 23(b)(3). Indeed, the very fact that multiple states' laws are at issue—even in the absence of any particular, currently identifiable differences between them—creates some risk that the class could fracture, given that the law of any one state could change or be clarified at any given time. Although that speculative possibility alone is unlikely to establish that individual issues predominate over shared ones, it does fall on the side of the scales weighing against permitting a multistate class action.

More important, though, is the extent to which the relevant states' laws actually diverge on the issues raised by the case. GCC seeks to state two claims on behalf of each member of the proposed class: (1) a claim for breach of contract; and (2) a declaratory judgment claim, calling on the court to declare rights under qualifying GCC insurance policies. Breach of contract is a well-established concept, and CMIC has identified no authority suggesting that the ordinary elements

24

of such a claim will, in and of themselves, differ between any of the states in any way but one, and that one difference appears to be of minimal importance here. Typically, a plaintiff asserting breach of contract "must prove the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011) (citation omitted). However, some of the states at issue also recognize, as a distinct element of breach of contract, the need for the plaintiff to establish his own "performance or excuse for nonperformance." *Maxwell v. Dolezal*, 231 Cal. App. 4th 93, 97, 179 Cal. Rptr. 3d 807, 811 (2014) (citations omitted). CMIC makes some cursory attempts to establish that that element will support substantial variation between class members, but those arguments are vague, speculative, and unconnected to any particular type of widespread nonperformance that one might expect in connection with claims such as these. (*See* Doc. No. 79 at 25.)

A review of the other, fully shared elements of breach of contract reveals a number of areas in which shared facts and law will predominate. There does not appear to be any disagreement between these parties regarding the uncontroversial premises that (1) CMIC's insurance contracts were valid and enforceable, (2) the underpayment of an insurance claim, contrary to the terms of the applicable policy, is a deficiency in performance, and (3) a policyholder who receives less than he was entitled to in connection with a claim has been damaged. The key arenas for potential state-to-state legal differences, therefore, appear to be the states' respective approaches to the interpretation of insurance contracts, the states' laws with regard to the availability or elements of particular defenses, and the states' approaches to damages.

On the topic of contractual interpretation, CMIC has identified three ways in which variations between states is supposedly likely to create obstacles to classwide resolution of claims: (1) the law in many of the states is unsettled regarding whether labor may be depreciated in

connection with an ambiguous ACV definition, with no decision by the state's court of last resort on point; (2) the caselaw of the respective states calls for different approaches to determining whether a contract is ambiguous and what role, if any, extrinsic evidence should play in the court's analysis of the contractual term; and (3) the states take different approaches to the so-called "reasonable expectations" doctrine in contractual interpretation.

The extent to which these differences arise in individual states, however, varies. CMIC, in its briefing, attributes the following issues to the following states:

- The law regarding whether ambiguous ACV provisions should be construed to exclude depreciation of labor is allegedly unsettled in Kentucky, Missouri, Mississippi, Ohio, Texas, and Vermont;

- There are allegedly unique or outlying features of the law regarding the identification of contractual ambiguity and/or reliance on extrinsic evidence in Vermont, Missouri, Illinois, and Texas; and

- There are allegedly unique or outlying features of the law regarding the "reasonable expectations" doctrine in Arizona, Illinois, and Ohio.

(Doc. No. 79 at 28–34.) Some of these alleged differences are debatable or inconsequential. For example, CMIC's characterization of Illinois law regarding contractual ambiguity and Texas law regarding extrinsic evidence appear, to this court, to rely on cherry-picking isolated language that does not actually suggest meaningful differences from the prevailing approach. More importantly, it is difficult to see how the latter two alleged differences—which involve general rules of contractual interpretation—would be relevant under the laws of the states in which there is already specific, binding guidance regarding how to interpret ACV provisions. With such specific guidance in place, there should be no need to reach for more general principles. For the states in

which the law on that first point is unsettled, however, state-specific variations in the law of interpreting insurance contracts do create additional layers of complications. The threshold issue that the court must consider, therefore, is the extent to which CMIC's first alleged difference—the unsettled nature of some states' laws regarding depreciation of labor—does create the potential for divergence between plaintiffs.

GCC has provided a multistate survey that, it argues, establishes that the laws of the relevant states all mandate functionally the same approach to depreciation of labor in the calculation of ACV pursuant to a provision that does not expressly permit that approach. (Doc. No. 70-8.) Of those ten states, however, GCC has identified only four in which that rule is actually set forth in an authoritative source. Three of the states—Arizona, Illinois, and Tennessee—have actually addressed the question through their courts of last resort. *See Walker v. Auto-Owners Ins. Co.*, 254 Ariz. 17, 517 P.3d 617, 623 (2022) ("[W]e conclude that if a policy adopts the [replacement cost less depreciation] methodology for determining actual cash value, . . . the insurer is precluded from depreciating labor when determining the actual cash value of the covered loss."); *Sproull v. State Farm Fire & Cas. Co.*, 2021 IL 126446, ¶ 54, 184 N.E.3d 203, 221 ("Where Illinois's insurance regulations provide that the 'actual cash value' of an insured, damaged structure is determined as 'replacement cost of property at time of loss less depreciation, if any,' and the policy does not itself define actual cash value, only the property structure and materials are subject to a reasonable deduction for depreciation, and depreciation may not be applied to the intangible labor component.") (citation omitted); *Lammert*, 572 S.W.3d at 179. A fourth state—California—has a binding regulation stating that "the expense of labor necessary to repair, rebuild or replace covered property is not a component of physical depreciation and shall not be subject to depreciation . . . ." Cal. Code Regs. tit. 10, § 2695.9(f).

For each of the other six states, however, GCC relies on one or more of the following: decisions of intermediate appellate courts; decisions of federal courts attempting to discern state law; or non-binding state regulatory guidance. (Doc. No. 70-8 at 2–3.) Those sources are relevant to the *Erie* analysis, but far from determinative. With regard to the intermediate appellate court decisions, the rule in the Sixth Circuit is that, while "[a] federal court should not disregard the decisions of intermediate appellate state courts," it is free to reach a contrary decision, if "convinced by other persuasive data that the highest court of the state would decide otherwise." *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999). Of the federal decisions, two were issued by courts—the Fifth Circuit (considering Mississippi law) and the Western District of Texas (considering Texas law)—with no power to set precedents binding on this court. *See Hall v. Eichenlaub*, 559 F. Supp. 2d 777, 782 (E.D. Mich. 2008) ("[A] district court is not bound by decisions of Courts of Appeals for other circuits.") (citation omitted). The court therefore would be required to do a complete, fresh *Erie* analysis for each of the relevant states.

GCC cites Sixth Circuit decisions with regard to the laws of Kentucky and Ohio, and those decisions, unlike the other federal decisions cited, are binding on this court—up to a point. *See Rutherford v. Columbia Gas*, 575 F.3d 616, 619 (6th Cir. 2009) ("[W]hen a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.") (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)). Circuit-level precedents regarding state law, however, provide less certainty than comparable precedents regarding federal law. For one thing, every Sixth Circuit *Erie* determination can be superseded by the relevant state court of last resort at any time. Moreover, as this court explored at length in *United States Roller Works, Inc. v. State Auto Prop. & Cas. Ins.*

28

*Co.*, No. 3:16-CV-2827, 2018 WL 1288942 (M.D. Tenn. Mar. 13, 2018), the Sixth Circuit has treated *Erie*-based precedents as more malleable than other precedents, subject to revisiting based on new data, such as new intermediate appellate court opinions, without a need for *en banc* overruling. *See id.* at *6 (discussing the Sixth Circuit's decision to effectively overrule *United States v. Driscoll*, 970 F.2d 1472 (6th Cir. 1992), despite the lack of an intervening decision by the relevant state court of last resort). Accordingly, while the applicable law of Kentucky and Ohio may be clearer than that of the other states, this court would still be required to consider the applicable state law closely, based on the lack of a decision from the relevant state court of last resort resolving the ACV depreciation issue.

Finally, GCC relies on an Insurance Bulletin issued by the Vermont Department of Financial Regulation. *See* Vt. Ins. Bulletin No. 184, 2015 WL 1975918 (VT INS BUL). Vermont Insurance Bulletins, however, "establish neither binding norms nor finally determine issues or rights." Vt. Ins. Bulletin No. 174, 2013 WL 1759873 (VT INS BUL), at *2. The Vermont statute that the Insurance Bulletin cites in support of its position, moreover, is general in nature and contains no language expressly addressing the issue of labor depreciation. *See* Vt. Stat. Ann. tit. 8, § 4724(9)(F). A claim under Vermont law, therefore—like a claim under Missouri, Mississippi, or Texas law or, to a lesser extent, Ohio or Kentucky law—would require this court to engage in a detailed *Erie* analysis. This court therefore finds that there is a substantial possibility that common issues of law or fact will not predominate if claims other than those arising in Arizona, California, Illinois, or Tennessee are included in the class.

CMIC identifies additional concerns, unrelated to the multistate nature of the class, that, it argues, also show that individual issues are likely to predominate over shared ones. First, CMIC argues that detailed, plaintiff-specific reviews of insurance claim files will be necessary to identify

29

and quantify specific alleged overpayments related to the depreciation of labor. Most of the information that CMIC identifies as necessary, however, involves relatively straightforward features of insurance claims, such as "(1) the actual amount of the claim, (2) the amount paid by CMIC, (3) the date(s) of payment(s) made by CMIC, (4) the number of estimates and payments (and what those payments were for), and (5) whether changes or supplements to . . . estimates have been made." (Doc. No. 79 at 3.) If identifying that kind of information posed a prohibitive obstacle, it would virtually eliminate insurance class actions altogether. Indeed, as far as the court can tell from the available evidence, GCC's allegations involving the calculation of ACV are, if anything, much simpler and more manageable than many, if not most, complaints beneficiaries could make regarding the handling of their insurance claims. GCC is simply suggesting that ACV should not have included some of the depreciation that it did. That is nothing more than a mathematical calculation. Correcting it would not require the comprehensive reevaluation of claims, reassessment of physical damage, or reconsideration of coverage.

Nevertheless, the parties do agree that the assessment of damages will require some individual review, although they disagree widely regarding how extensive. Claims based on the imposition of a faulty depreciation formula are, generally speaking, "data driven," such that "they can be measured by a common arithmetic formula." *Arnold v. State Farm Fire & Cas. Co.*, No. 2:17-CV-00148-TFM-C, 2020 WL 6879271, at *9 (S.D. Ala. Nov. 23, 2020). The relevant figures, however, still have to be found, collected, and placed into that formula, which must be done for each individual claim. Johnson, in his report and later supplementation, outlines how that process can, at least in part, be performed relatively simply with the assistance of preexisting claim processing data and software. (Doc. No. 68-3 ¶¶ 4–8, 31; Doc. No. 72-3 ¶¶ 6–19.)

30

CMIC has responded with a rebuttal report by its own expert, insurance adjuster Robert E. DeFusco. (Doc. Nos. 79-1, -2.) DeFusco concedes that, "if we were simply looking at the Xactimate .ESX files to determine whether non-material depreciation was withheld[,] the process would be straightforward." (Doc. No. 79-1 at 5.) However, he identifies complications that, he asserts, would make the process considerably more demanding and time-consuming. First, he states that the data, taken in isolation, does not expressly provide claim payment dates, causing a need for further review in order to calculate interest. He estimates that, for each of the several thousand claims at issue, this process would require "another 5-6 minutes to determine the date paid, calculate any interest, and record the data." (*Id.*) Second, and probably more importantly, DeFusco states that the data for the overwhelming majority of the claims at issue—6,232 of 6,940—does not, in fact, match CMIC's records regarding what was actually paid. These differences, DeFusco explains, represent payment-related decisions and actions that can only be recreated and understood by reviewing individual claim files—largely negating much of the convenience and efficiency attained by relying on the raw data in the first place. (*Id.* at 5.)

GCC points out the DeFusco admitted, in his deposition testimony, that he based his analysis on PDF files of claims data and that he did not consider any potential efficiencies that could be obtained by using the actual claims software itself. (*See* Doc. No. 85-1 at 41–42.) DeFusco also conceded that insurance companies routinely devote comparable amounts of time to ordinary claims adjustment. (Doc. No. 35-1 at 42–49.) During the deposition, counsel for GCC used numbers that DeFusco had provided to estimate a total cost of about $70,000 to analyze the estimated 6,232 claims that would need closer review, and DeFusco did not take issue with that estimate, other than noting that he was relying on counsel's characterizations and was not checking the math himself. (*Id.* at 49.)

The court finds that, although CMIC has established a likelihood that damages assessment will be more demanding than GCC initially suggested, GCC has nevertheless shown that the process is likely to be manageable and not to predominate over the shared issues at the center of this case. Looking through thousands of files to identify types of depreciation may sound onerous, but it is also, fundamentally, just what insurance claims processing entails. It would certainly be nice if all damages could be assessed with spreadsheets alone, but it is neither remarkable nor prohibitive that they, in many instances, cannot be. The analysis required here, moreover, would be relatively straightforward, even if it had to include individual file review.

GCC is not challenging any aspect of CMIC's claims handling process other than the depreciation of labor. If a proposed class action *did* call on an insurer to perform a complete do-over on thousands of claims, then the expense of doing so might pose real workability and predominance problems. *See, e.g., Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011) (rejecting class that would have called for "class-wide roof reinspection"). In this instance, however, there is no need for that kind of starting over or second guessing, only a much more limited need to determine what the ultimate payment would have been, had labor not been depreciated. The Sixth Circuit has already held that this precise damages model, directed at this precise type of wrongdoing, is consistent with class certification, *see Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020), and, while it is possible that complications unique to this case could call for a contrary result, there is no evidence that such complications actually exist in a meaningful enough volume to make a difference.

Finally, the court sees no basis for concluding that any of CMIC's asserted defenses is likely to change the predominance analysis in its favor. In CMIC's Answer, it states eighteen of what it refers to as "affirmative defenses." (Doc. No. 48 at 7–10.) Many of those defenses are not

affirmative defenses in the true sense, but simply different ways of phrasing the argument that plaintiffs will be unable to make their affirmative case. *See Roberge v. Hannah Marine Corp.*, 124 F.3d 199 (Table), 1997 WL 468330, at *3 (6th Cir. 1997) ("An affirmative defense, under the meaning of Fed. R. Civ. P. 8(c), is a defense that does not negate the elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claim are proven."). The analysis of predominance with regard to those defenses is, therefore, fully encompassed by the court's analysis of predominance with regard to the claims themselves.

Other of the stated affirmative defenses are, in fact, affirmative defenses, although the boilerplate nature of CMIC's pleading gives the court no clues regarding how those defenses might be expected to arise. CMIC's briefing does not make its expectations much clearer. CMIC argues, without much explanation, that some of the stated affirmative defenses will give rise to meaningful variation between class members, but it still fails to explain why or how. For example, CMIC argues that the possibility of an "accord and satisfaction" defense causes individual issues to predominate over shared ones, but it does not provide any explanation for why that defense would be expected to arise in connection with any significant number of class members' claims. (*See* Doc. No. 48 at 9; Doc. No. 79 at 26.)

"Speculation alone does not defeat predominance." *In re Tivity Health, Inc.*, No. 20-0501, 2020 WL 4218743, at *1 (6th Cir. July 23, 2020) (citations omitted). CMIC's position seems to be that a defendant facing a proposed class action can defeat a showing of predominance simply by loading its answer to the complaint with enough boilerplate recitations of defenses that seem, generally, like the kind of defenses that might arise in the general type of case at issue—common insurance defenses to defeat an insurance class action, common products liability defenses to defeat a products liability class action, and so forth. But the bare theoretical prospect of some

33

plaintiff-specific defenses is present in many class actions—possibly *all* class actions—and that prospect typically will not defeat a showing of predominance unless the defenses are (1) likely to actually arise and (2) either numerous or likely to "raise complex, individual questions." *Brasher v. Allstate Indem. Co.*, No. 4:18-CV-00576-ACA, 2020 WL 4673259, at *13 (N.D. Ala. Aug. 12, 2020) (quoting *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1240 (11th Cir. 2016)). There has been no showing that such a risk is meaningful in this case.

The District Court for the Eastern District Kentucky fairly recently observed, in an opinion certifying a single-state class based on another insurer's improper depreciation of labor, that "courts in jurisdictions where labor depreciation has been found to be unlawful have uniformly found that common issues predominate in cases challenging insurers' deprecation of labor costs." *Hicks v. State Farm Fire & Cas. Co.*, No. 14-CV-00053-HRW, 2019 WL 846044, at *5 (E.D. Ky. Feb. 21, 2019) (collecting cases), *aff'd and remanded*, 965 F.3d 452 (6th Cir. 2020). There have been some arguably contrary results since then,[5] but it remains the case that most courts have found that labor depreciation cases are, as a general matter, appropriate for classwide resolution. If this case involved a single jurisdiction, the court would have little hesitation in following those courts' lead and certifying the class in full. The multistate nature of the case, however, significantly complicates matters. CMIC overreaches when it argues that a court can never certify a multistate class relying on different states' laws, unless there is a separate lead plaintiff for each state. At the same time, however, GCC overreaches when it characterizes this case as involving "a single, predominating question: whether, as a matter of law, CMIC breached its standard-form policies by withholding labor as depreciation." (Doc. No. 68 at 31.)

---

[5] *See Cranfield v. State Farm Fire & Cas. Co.*, No. 1:16CV1273, 2021 WL 3376283, at *6 (N.D. Ohio Aug. 2, 2021) (denying class certification without prejudice due to, among other things, variations between the specific insurance policies at issue); *Brasher*, WL 4673259, at *12 (denying class certification based on, among other things, uncertainties regarding the ability to calculate damages from available data).

34

Each of the ten states encompassed by the proposed class is a separate juridical entity with its own body of laws, its own court of last resort, and an entitlement to its own, distinct analysis under *Erie*. Such analyses are simple when the relevant court of last resort has already spoken on an issue, but significantly less so when it has not. Moreover, because the central question in this case involves contractual interpretation, the court's case-by-case consideration would not simply have to account for variations on the central question, but also variations on any relevant subsidiary questions regarding contractual interpretation, such as whether the court should consult extrinsic evidence or consider the parties' "reasonable expectations." *Cf. Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 601 F.3d 1159, 1176–77 (11th Cir. 2010) ("Even the most common of contractual questions—those arising, for example, from the alleged breach of a form contract—do not guarantee predominance if individualized extrinsic evidence bears heavily on the interpretation of the class members' agreements."). GCC argues that its proposed class will be manageable, even if some states end up answering the case's central question differently than others, and that might be true if checking each state's laws was as simple as just comparing ten clear, but different, statutes. It is, however, the unsettled nature of the laws of several of the states—not merely their capacity for divergence—that would make a ten-state class prohibitively unwieldy. The problem is not that class members in some states might win, while class members in other states might lose. It is that, for six of those states, the court would have to embark upon a unique, state-by-state investigation before it could reach a conclusion regarding which of those outcomes is called for.

Based on the foregoing, the court concludes that GCC has failed to show that common issues would predominate over individual issues for its entire, ten-state proposed class. However, "district courts have broad discretion to modify class definitions," *Powers v. Hamilton Cnty. Pub.*

*Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007), and the court cannot ignore the fact that the uncertainties that CMIC has identified are not evenly distributed between the states at issue. A court attempting to manage a class including all ten of these states might well end up needing to make so many *Erie* guesses that the guesswork would overwhelm the ordinary work of adjudication. Four states, however, will require little guessing at all, either because their courts of last resort have spoken or, in California's case, because there is a regulation directly on point. If the court confines itself to those states, then this becomes a fairly ordinary insurance class action, in which some individualized damage calculations will be necessary but which is nevertheless structured around a central theory of liability shared by the class and capable of classwide resolution. A class encompassing only claims from Arizona, California, Illinois, and Tennessee, therefore, would be a class in which shared questions would be expected to predominate.

Such a class would also comply with the "implied ascertainability requirement" of Rule 23(b), which demands that the "class definition . . . be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Hicks*, 965 F.3d at 464 (quoting *Sandusky Wellness Ctr.*, 863 F.3d at 466; *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012)). The report that Johnson prepared for GCC goes into detail regarding how the class can be ascertained by reviewing ordinary features of underlying insurance claims, such as the date of the loss, whether the loss involved a building, and whether the estimates relied on by CMIC included depreciation for costs other than materials. (Doc. No. 68-3 ¶¶ 4–8, 31.) CMIC has identified some potential complications that could arise, but they do not rise to the level of defeating the showing of ascertainability. The Sixth Circuit, moreover, has already upheld a finding of ascertainability regarding similar claims. *See Hicks*, 965 F.3d at 465.

36

Finally, the court concludes that, if one limits the proposed class to the states of Arizona, California, Illinois, and Tennessee, then a class action will be superior to other available methods for fairly and efficiently adjudicating the controversy. *See Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 377 (8th Cir. 2018) (affirming finding that class action form is superior in ACV labor depreciation case). Although the dollar amounts at issue in these claims are not negligible, it appears that any particular class member's recovery is likely to be relatively small, compared to the sums at issue in most federal court litigation. Many of the plaintiffs' injuries, therefore, likely fall within the unfortunate range of damages in which the plaintiff's loss is large enough to cause pain or hardship, but small enough to make it a challenge—if not outright impossible—to litigate the injury in a cost-effective way. Class actions are particularly appropriate to such situations. *See Pfaff v. Whole Foods Mkt. Grp. Inc.*, No. 1:09-cv-02954, 2010 WL 3834240, at *7 (N.D. Ohio Sept. 29, 2010) ("The 'most compelling rationale for finding superiority in a class action' is the existence of a 'negative value suit.' A negative value suit is one in which the costs of enforcement in an individual action would exceed the expected individual recovery.") (quoting *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 348 (N.D. Ohio 2001)); *see also Mitchell v. State Farm Fire & Cas. Co.*, 327 F.R.D. 552, 564 (N.D. Miss. 2018) (acknowledging applicability of "negative value" argument to ACV labor depreciation case), *aff'd*, 954 F.3d 700. A somewhat narrowed class, moreover, should significantly reduce the potential that the case will get bogged down in variations between class members. The court, accordingly, concludes that GCC has satisfied Rule 23(b)(3) with regard to a modified class that includes only Arizona, California, Illinois, and Tennessee. The court will certify the class, appoint GCC as the class representative, and appoint GCC's attorneys as class counsel.

### 3. Declaratory Judgment Claim

Near the end of CMIC's Response in opposition to GCC's request for class certification, CMIC veers away from the topic at hand to suggest that the "putative class claim for declaratory judgment and relief (Count II of Plaintiff's Second Amended Complaint) should be dismissed or stricken." (Doc. No. 79 at 40.) CMIC has not, however, actually filed a motion to that effect. GCC addresses this argument briefly in its Reply, suggesting that "[i]t would be premature to dismiss Plaintiff's claim for declaratory relief, as class proceedings have yet to begin." (Doc. No. 85 at 15.)

The issues that have actually been raised in connection with appropriate motions in this case are complex enough, without the court also having to chase down phantom motions tucked into the parties' briefing. Only three questions are actually before the court in connection with an appropriate motion: (1) whether GCC can raise class claims under the laws of states other than Tennessee; (2) whether the court should grant CMIC judgment on the pleadings as to any claims based on Texas law; and (3) whether GCC is entitled to certification of a class. The court has answered those questions, and any others can be raised through motions appropriate to the relief requested.

### 4. Notice by Mail

"For any class certified under Rule 23(b)(3) . . . the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). GCC requests that class notice be sent to each person on the list of potential class claims that it has identified. GCC concedes that "the list might include a portion of claims not within the class," but it argues that that fact should not prevent the court from ordering notice at this stage. (Doc. No. 68 at 37.) CMIC

does not respond to this portion of GCC's briefing. The court, accordingly, will order the parties to work together in an attempt to reach an agreement regarding class notice.

## IV. CONCLUSION

For the foregoing reasons, CMIC's Motion to Dismiss Claims Arising Under Non-Tennessee Law for Lack of Standing or, In the Alternative, for Judgment on the Pleadings on Claims Arising Under Texas Law (Doc. No. 49) will be denied, and GCC's Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel (Doc. No. 67) will be granted in part and denied in part. The court will certify a class encompassing plaintiffs in Arizona, California, Illinois, and Tennessee only.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge